IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2023 Session

**STATE OF TENNESSEE v. MICHAEL LEE WOODS, JR.**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-83      Steve R. Dozier, Judge**

_____

**No. M2022-01168-CCA-R3-CD**

_____

Michael Lee Woods, Jr., Defendant, was convicted by a jury of two counts of first degree murder, one count of felony murder, one count of attempted first degree murder, one count of employing a firearm during the commission of a dangerous felony, and one count of possession of a firearm after having been convicted of a felony drug offense. The convictions stemmed from an incident that left two people dead and one person paralyzed. Defendant was sentenced to an effective sentence of two consecutive life sentences plus 10 years. Following the denial of a motion for new trial, Defendant appealed, challenging: (1) the trial court's decision to permit the State to introduce evidence of Defendant's involvement in two unrelated shootings in violation of Tennessee Rule of Evidence 404(b); (2) the trial court's decision to permit the State to introduce a video clip in which Defendant is seen brandishing a gun; (3) the sufficiency of the evidence with respect to the convictions for first degree murder, felony murder and attempted first degree murder; and (4) his sentence. Defendant also alleges that cumulative errors during the trial entitle him to reversal of the convictions. Because trial counsel failed to object to the introduction of evidence about the two unrelated shootings as well as the video clip of Defendant brandishing a gun and Defendant failed to establish all five factors necessary for plain error review, he is not entitled to relief on those issues. Moreover, we determine that the evidence was sufficient to support the convictions and that the trial court did not abuse its discretion in sentencing Defendant. Consequently, the judgments of the trial court are affirmed. However, we remand the matter to the trial court for correction of the judgment form in Count 5 to reflect that the sentence runs consecutively to Counts 1, 2, and 4.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TOM GREENHOLTZ, JJ., joined.

Manuel B. Russ (on appeal); and Joy Kimbrough (at trial), Nashville, Tennessee, for the appellant, Michael Lee Woods, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilbur, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Background*

In January of 2017, Defendant and a Codefendant[1] were indicted for two counts of premeditated murder, one count of felony murder, one count of attempted first degree murder, and one count of employing a firearm during the commission a dangerous felony. Defendant was also indicted for one count of felon in possession of a weapon. The indictments arose from a shooting that took place in Nashville in November of 2016. The shooting left two people dead and a third victim paralyzed from the waist down.

The development of Defendant and Codefendant as suspects occurred during the Metropolitan Nashville Police Department's investigation of several other shooting incidents and may or may not have been tied to the attempted theft of a dirt bike by a teenager. These prior shooting incidents took place in August and October of 2016.

Prior to trial, the parties had a hearing on several motions in limine filed by the State as well as argument by counsel for Defendant about the proposed testimony of a witness, John Williams. Mr. Williams allegedly saw Defendant fire a gun in August of 2016. During the hearing, counsel for Defendant referenced a prior hearing on the matter where the trial court allegedly ruled that the State could call Mr. Williams to testify that he saw Defendant fire a gun on August 29, 2016. It is not entirely clear when this prior hearing was held or whether this prior hearing was a 404(b) hearing or merely a hearing on pretrial motions. To further complicate matters, there is no motion in the record filed by counsel for Defendant pursuant to Rule 404(b), there is no transcript of this prior hearing in the technical record, and there is no order from the trial court memorializing this ruling on the admissibility of Mr. Williams's proposed testimony about the August 29, 2016 shooting.

---

[1] For reasons that are not entirely clear from the record, Codefendant's name is redacted from the entire record. From what we can glean, after Codefendant was found not guilty of any of the charges at trial, his record was expunged. As a result of his name being absent from the record, we will refer to him simply as Codefendant. Additionally, the State filed two sets of indictments on the same day. The second set of indictments is not labeled as amended, but appears to correct a typographical error in Count 5, changing the date of the shooting from August 29, 2016, to November 27, 2016.

Despite the complete absence of any information about this prior hearing in the record, there was discussion between the trial court and counsel for both the State and Defendant indicating that the trial court determined at the prior hearing that the probative value of the testimony from Mr. Williams about the August shooting outweighed its prejudicial effect because identity was a key issue in this case. This discussion occurred at a pretrial motions hearing. The trial court recalled from the earlier hearing that the State was not trying to introduce specific evidence of a prior bad act, but rather that Mr. Williams saw Defendant fire a gun in August. Defense counsel informed the trial court that they did not oppose the ruling on the testimony of Mr. Williams. The trial court made clear that the State could not go into any bad acts or the "details of the 8/29 incident" but would be permitted to introduce testimony from Mr. Williams to show Defendant's identity.

*Trial Testimony*

At trial, Damien King testified that he was thirteen at the time of the October and November shootings. He lived on Saint Louis Street with his mother, Robin King; his step-sister, Sekiyah Miller; and Chad Miller, his mother's boyfriend and the father of Ms. Miller. Mr. King considered Mr. Miller a father figure because Mr. Miller had been a part of Mr. King's life since infancy. Mr. King was in the eighth grade in the fall of 2016.

Over fall break of 2016, Mr. King and a friend, Paul Dunn, were "hanging out" when Mr. Dunn told him he saw a dirt bike in the alley a few streets down from Mr. King's house, on 14th Avenue North. Mr. Dunn proposed that they steal the dirt bike. Mr. King agreed. At first, Mr. Dunn stated that Mr. King would get the bike out of the garage, but Mr. King offered to act as lookout so Mr. Dunn could steal the bike. The boys went to the garage, and Mr. Dunn entered the garage and rolled the bike down the alley. Mr. Dunn did not know how to operate the gas-powered dirt bike because it had a clutch. Mr. King got on the bike and started it. He drove the bike about 30 feet down the alley before a "black Nissan came flying behind" them. Someone from the car shouted, "that's my cousin's dirt bike." Mr. King, startled, jumped off the bike and dropped it to the ground. Mr. King saw the car stop and the driver get out of the car. Mr. King did not recognize him. The boys left without the bike.

When Mr. King and Mr. Dunn returned to school the next day, "everyone" was talking about the theft of the dirt bike. Marcellus Devons, a student at school, spread a rumor that Mr. King stole the dirt bike. Mr. King later learned that the bike was at Mr. Devons's uncle's house. Mr. King did not initially tell his mother or Mr. Miller about the attempted theft of the dirt bike.

After fall break, on October 24, 2016, Mr. King was "chilling" at the home of a friend about five houses down Saint Louis Street from his own house when he heard gunshots. Mr. King saw "a car flying down the street towards DB Todd [Boulevard]" and then saw "cop cars coming up the street." Eventually, he realized that the police cars were headed toward his house, so he took off "striking off down the street to go see who it was and [he saw his] dad's friend Brock laying in the grass, he had got shot."

Ms. Miller was in sixth grade at the time of the October 24, 2016 shooting. She was at home that afternoon, in the living room playing with her dogs when her father, Mr. Miller, and his friend Brock Richardson arrived at the house. She looked outside and could see her father, Mr. Richardson, and two other people. There was a car outside with the driver's side door open. The car did not belong to Mr. Miller or Mr. Richardson. She did not recognize either man but described them both as African-American. One of the men was slim, and the other was larger. Ms. Miller could tell by the voices of the two men that they were angry. She was curious about what was happening, so she went outside and stood on the porch. Ms. Miller heard the larger man ask Mr. Miller for a picture of Mr. King. Mr. Miller refused. Ms. Miller heard the men mention a dirt bike.

Ms. Miller described the tone of the conversation between Mr. Miller and the men as "aggressive." Ms. Miller saw her father turn away from the men to face the house and start walking away. Mr. Richardson started walking toward his own car, but in order to do so had to walk around the two men. Ms. Miller saw the slim man pull out a black gun and shoot Mr. Richardson. Mr. Richardson grabbed his stomach and tried to run toward the house, but he did not make it and fell to the ground. The shooter continued to fire the weapon at Mr. Miller as he ran to the house.

Ms. Miller ran into the house as the shots were fired. She was scared. She talked to the police that night and on several other occasions. She was unable to identify anyone on the day of the shooting. Ms. Miller testified at trial that she identified two people at a later date, but the officer wrote down that no identification was made.

Mr. King also spoke to police on the day of the October shooting. He initially denied that he was involved in the theft of the dirt bike because he was afraid that he would get into trouble. Mr. Miller was unable to identify the shooter or the other man. Mr. Richardson died as a result of his injuries from the October 24 shooting.

Mr. King eventually told his mother about the theft of the dirt bike. Ms. King arranged for Mr. King to speak with Metropolitan Nashville Police Detective Richard Ford, who also served as the School Resource Officer at Mr. King's school, about the dirt bike. Mr. King showed the officers where he found the bike.

- 4 -

Ms. King recalled the afternoon of October 24. She was at work when the shooting took place. Her children were at the house with Mr. Miller. Ms. King knew that Mr. Miller had a problem with drugs and that the two often fought about the fact that he used and sold drugs. Ms. King did not allow Mr. Miller to use drugs around the children. However, Ms. King was aware that Mr. Miller sometimes bought large quantities of drugs and sold them in the front yard. She recalled that he normally spent around $2000 on drugs he sold.

There were six .40-caliber Smith & Wesson cartridge casings recovered from the area near the Saint Louis Street house after the October 24 shooting. The house had bullet damage. Three cartridge casings were found in the front yard between the front of the house and the fence. One cartridge case was found in the street and two more casings were found in a grassy area across the street. According to Detective Ford, Ms. Miller was unable to identify anyone in the first photographic lineup she was shown. She identified a person in the second lineup, claiming she had seen the person before. It was not Defendant. Detective Ford ultimately did not think that Ms. Miller made a positive identification of the shooter.

Ms. King, Mr. King, and Ms. Miller moved out of the Saint Louis Street home after the shooting. Mr. Miller remained a resident of the home.

On November 27, 2016, Kenneth Pullens and Charity Adams went to Mr. Miller's house on Saint Louis Street. Mr. Pullens had been dating Ms. Adams for about three or four months. Mr. Pullens had known Mr. Miller for seven or eight years. Mr. Pullens was semi-homeless at the time, living in various hotel rooms around town. Mr. Miller was storing some of Mr. Pullens's clothes at his house. Mr. Pullens and Ms. Adams picked Mr. Miller up at his house, drove to East Nashville to buy marijuana, and returned to Mr. Miller's house to smoke it. The marijuana was laced with cocaine.

After the trio smoked the laced marijuana, Mr. Pullens got a crate of his clothing from Mr. Miller's house and carried it to his car parked in the driveway. Mr. Miller and Ms. Adams stood next to the car talking while Mr. Pullens placed the crate of clothing in the back seat of his Camaro.

Suddenly, Mr. Pullens was shot in the back. He fell to the ground and was unable to move his legs. He saw two people get out of a "silver bluish" car on the street. Ms. Adams was lying in the grass. He thought she had been shot. Mr. Pullens crawled toward Ms. Adams. He managed to cover Ms. Adams's body with his own body. Mr. Pullens recognized the two people "[f]rom the neighborhood, growing up" as Defendant, also

known as "Fox," and Codefendant.[2]  Mr. Pullens testified that "Fox" was the shooter.  He was the person who got out of the passenger side of the car.  Defendant had a "short cut" and Codefendant had "dreads."

When he was shot, Mr. Pullens was standing outside the gate and close to the street. He watched Defendant go through the gate and over to Mr. Miller, who was lying on the ground bleeding inside the gate.  Mr. Pullens could hear Mr. Miller saying, "What did I do? I didn't do nothing."  Mr. Pullens testified at trial that he saw Defendant shoot Mr. Miller in the head from "pretty close."  Mr. Pullens did not know how many times Defendant fired the gun.  Mr. Pullens saw Codefendant "rushing" Defendant and heard him tell Defendant to "come on."  Mr. Pullens heard Codefendant call Defendant "cuz."  Mr. Pullens testified that Defendant and Codefendant got back into the car and the car drove away.

Mr. Pullens "focused" on getting Ms. Adams's phone out of her purse.  Mr. Pullens got the phone and dialed 911.  Several 911 calls were played for the jury, including the call from Mr. Pullens.  During one call, the caller reported he heard seven gunshots followed by a single gunshot about a minute later.  This caller reported the shooters were in a gray Impala or silver Malibu.  The second caller saw a man get shot at "point blank range" before the shooters left in a silver or gray car.

Mr. Pullens was still conscious when help arrived.  Mr. Miller was still alive but was gravely wounded.  Ms. Adams was already dead.  Mr. Pullens told the emergency medical personnel he did not want to die in the street.  He was transported to Vanderbilt where he remained for a "week and [a] half."  From there, he was transferred to a rehab facility for a few weeks.  Mr. Pullens remains paralyzed from the waist down from his injuries.

Officer Brandon Rardin responded to a "shots fired" call on Saint Louis Street around 2:50 p.m. on November 27.  When he arrived, Mr. Pullens was lying over the top of a white female on the ground, later identified as Ms. Adams.  She was already dead from what appeared to be a gunshot wound to the neck.  Officer Rardin heard screaming coming from nearby and saw a white male later identified as Mr. Miller curled up on the ground. Officer Rardin saw gunshot wounds to Mr. Miller's leg and head.  Mr. Miller was transported to the hospital but died from his injuries.

---

[2] Again, Codefendant's name is redacted from the transcript.  The court reporter labeled the Codefendant as "Expunged Codefendant" and, according to the State, did not transcribe his trial testimony. The opening statement and closing argument from counsel for Codefendant do not appear in the record.

According to the medical examiner, Ms. Adams was killed by a "gunshot wound [to] the right arm continuing into the torso and neck." Ms. Adams's carotid artery was torn in half by the shot, causing significant blood loss and loss of oxygen to the brain. According to the medical examiner, Ms. Adams lost consciousness "pretty quickly" and likely died within "seconds to minutes."

Mr. Miller, on the other hand, suffered multiple gunshot wounds. The medical examiner noted a total of four gunshot wounds: one to the right side of the back of the head; one to the left thigh; and two graze wounds. There was some stippling behind Mr. Miller's ear, indicating that he was shot from an intermediate range of a couple of inches to a couple of feet.

Mr. Pullens offered conflicting testimony with regard to his identification of the shooters. He identified Defendant and Codefendant in photographic lineups while he was in the hospital and again at trial. However, Mr. Pullens admitted that he testified at the preliminary hearing that Codefendant did not get out of the car and that he "probably" remembered testifying at the preliminary hearing that he did not know Defendant and had never seen him before the shooting.

Crime scene investigators recovered 15 shell casings near the home on Saint Louis Street after the November shooting. According to an expert who testified at trial, six of the casings came from a .40-caliber handgun, while nine of the casings came from a 9-millimeter handgun. Fourteen of the shell casings were located near the street. One .40-caliber cartridge case was located inside the gate near where Mr. Miller's body was found, and a bullet was found in the neighbor's yard. Officers were not able to recover any fingerprint evidence from the casings. The blue Camaro had a bullet "defect" in the passenger window and a copper-jacketed projectile was found in the backseat. There were three bullet defects in the front wall of Mr. Miller's home, two near the front door, and two in the vehicle.

Lerosha Groves was dating Defendant in October of 2016. She lived on 14th Avenue near the location from where the dirt bike was stolen. Her mother owned a gray/silver Hyundai Sonata that Ms. Groves drove. Ms. Groves let Defendant borrow the car on at least one occasion. In an interview on November 29, Ms. Groves told officers that she drove Defendant down Saint Louis Street on either November 25 or 26 and that she did not know why Defendant asked her to drive down that street. Later, Ms. Groves claimed that she only drove down Saint Louis Street to get to the phone store to pay a phone bill. Ms. Groves did not know Codefendant but knew that he was friends with Defendant.

Detective Gary Shannon was assigned to investigate the November shooting. During his investigation, he reviewed the case file for the October shooting at the Saint Louis Street residence and suspected that the two shootings were related. Detective Shannon showed a picture of Ms. Groves' car to Mr. Pullens while he was in the hospital. He stated that it looked similar to the car in which the shooters rode. Video from the security camera at the phone store down the street showed images of a silver car similar to Ms. Groves's vehicle driving down the street on the day of the shooting.

Detective Ford testified that he initially developed Codefendant as a suspect in the October shooting but later learned that Codefendant was wearing an electronic monitoring device that indicated he was not in the location of the shooting at the time of the shooting. Codefendant apparently spoke with police, provided a DNA sample, and consented to a search of his phone.

Detective Jason Frank was working on another unrelated case in the fall of 2016. As part of that investigation, he interviewed John Williams. Mr. Williams did not have any relevant information for Detective Frank's case, but relayed some information about the shooting in August of 2016 on 14th Avenue North. Detective Frank passed that information on to other officers at the police department, including Detective Nicholas Kulp.

Detective Kulp left a card for Mr. Williams at his residence. Mr. Williams was initially interviewed by police on August 31, 2016. This interaction was recorded. Mr. Williams then called Detective Kulp and left a voicemail on September 1, 2016. Detective Kulp eventually "ran into" Mr. Williams "[a] couple of months later" and Mr. Williams agreed to an interview.

At trial, Mr. Williams expressed that he was unhappy to testify. He was ultimately considered a hostile witness after claiming he "didn't see sh[**]" and that he was a "crack head" with a bad memory. Mr. Williams gave conflicting testimony at trial.

Mr. Williams testified that he mowed lawns to support his addiction to crack cocaine. He testified that on August 29, he was mowing grass for "D.P." Mr. Williams first testified that he heard shots fired, then claimed he "didn't hear no shots fired" and that it could have been the "lawn mower backfiring." Mr. Williams knew Defendant by the name of "Fox." He acknowledged that when he was being interviewed by a detective, he circled Defendant's photograph in a lineup and initialed the lineup. Mr. Williams again reiterated that he did not see anyone shooting and that he did not know what kind of car was on the street that day despite leaving a voicemail for Detective Kulp in which he said that he "[had] seen Fox on 12th [Avenue]" on the day of the August shooting. Mr. Williams admitted that officers came to his house but testified that he told them he had not seen

anything. Defense counsel asked Mr. Williams if he told officers that he saw Fox that day, to which he replied, "I seen Fox on 12th when I was coming through with the lawn mower to go to 14th to cut that yard" but reiterated that he could not see anything from the backyard and continued to mow until officers who responded to the shooting call instructed him to stop.

Mr. Williams testified that he did not see Defendant shoot anyone and that he did not see a car but admitted that he saw Defendant that day "on 12th [Avenue]." When asked one final time whether he saw Defendant shoot that day, Mr. Williams replied, "I did not see him shoot anyone. I did not see him with a gun." Mr. Williams admitted that he received a subpoena to testify and stated that he was not afraid to testify but admitted that he thought he could be killed because of his testimony.

The trial court allowed Mr. Williams's first interview on August 31 with Detective Kulp to be played to the jury as a prior inconsistent statement. The trial court instructed the jury that "[c]onsistent statements made during the portion of that particular recorded statement can be used for purposes of testing the witness', Mr. Williams' credibility. But the inconsistent portions that are played . . ., if any, can be used by you substantively because they're recorded." During the first interview with Detective Kulp, Mr. Williams told the officer that he did not see anything but that he heard a lot of gunshots. He stated that he continued to mow grass until instructed not to do so by the officers. Mr. Williams told officers he knew Defendant and did not know who was in the car he saw but heard "boom, boom, boom, boom, boom." Mr. Williams saw a gold and burgundy car and a "white car" down the street. When asked by officers why he said he saw Defendant, Mr. Williams explained that he saw Defendant earlier on 12th but could not say if Defendant shot anyone.

The trial court also permitted the State to introduce the September 1 voicemail Mr. Williams left the detective as a prior inconsistent statement. In the voicemail, Mr. Williams said that he saw "a white Impala, and yes, . . . [Defendant] was down there."

During another interview on November 4, Detective Kulp presented Mr. Williams with a photographic lineup. Mr. Williams identified Defendant as the shooter. Mr. Williams circled Defendant's photograph and put his initials and the date. The trial court instructed the jury that the statements made by Mr. Williams would only be offered "for their determination about [his] credibility [as a witness]."

Lynnette Mace testified as a crime scene technician with the Metro Nashville Police Department. She processed the scene on 14th Avenue North on August 29, 2016. She helped to collect seven .40-caliber Smith & Wesson Winchester cartridge casings from the scene. She also processed the scene on Saint Louis Street on October 24, 2016. There,

they recovered six .40-caliber Smith & Wesson cartridge casings, one projectile, and documented a defect in the front of the residence.

Felicia Evans of the Metro Nashville Crime Lab testified as a forensic scientist firearms examiner and was certified as an expert in firearms and tool mark identification. She tested the cartridge casings from the August 29 incident and discovered they were fired from the same .40-caliber firearm. Likewise, the cartridge casings from the October shooting were fired from the same .40-caliber firearm. When she scanned a casing into the National Integrated Ballistic Information Network, overseen by the Bureau of Alcohol, Tobacco, and Firearms, she confirmed that the casings from the August shooting were shot from the same gun used in the October shooting. The bullets from the October shooting were from a company called CBC. None of the bullets from the October shooting were manufactured by Speer. One of the bullet fragments from Mr. Richardson's body from the October shooting was similar to a .40-caliber Smith & Wesson bullet.

Ms. Evans analyzed the 15 cartridge casings from the November shooting. The seven .40-caliber casings came from three different manufacturers. Four were from CBC, two were from Winchester, and one was from Speer. There were eight 9-millimeter Luger casings from Remington. All of the 9-millimeter cartridges were fired from the same gun. Ms. Evans was able to determine that the same gun fired the seven cartridges in the August shooting and the six cartridges from the October shooting as well as the one Speer cartridge found near Mr. Miller's body inside the gate after the November shooting. According to Ms. Evans, the four CBC and two Winchesters were fired from the same gun, but did not match the gun used in the August shooting or in the October shooting. Bullet fragments from Mr. Miller's scalp were from a .38-caliber bullet commonly used in .38 specials and .357 magnums. A fragment of a bullet from Mr. Miller's thigh was consistent with a .38-caliber jacket used in 9-millimeter Luger cartridges. Ms. Evans explained that .38-caliber jackets were compatible with 9-millimeter Lugers, a ".380 auto," .357 magnums, and .38 specials. In her expert opinion, during the November shooting, given the different types of bullets used, there could have been two guns using the .38-caliber bullets. In addition, one 9-millimeter Luger was used. Ms. Evans opined that there were a minimum of three and maximum of four guns used in the November shooting.

The State also introduced extensive cell phone technology evidence through Detective Chad Gish, an expert in digital forensic analysis. Detective Gish analyzed an HTC D100 phone with an Android operating system and a Coolpad phone. The HTC phone, linked to Codefendant, was analyzed prior to the November shooting. The phone contained a contact labeled "Fox Trap" with the number 615-429-8XX7. Texts showed that devices associated with Defendant and Codefendant were in contact with one another between August and October 2016. "Fox Trap" called the HTC phone at 7:07 p.m. on

October 24. Call logs showed several calls between "Fox Trap" and the HTC phone on October 25, 26, and 27.

Detective Chad High of the Surveillance and Investigative Support Unit of the Metro Nashville Police Department testified that he was an expert in the field of call detail analysis. He ran reports on a phone associated with Defendant, an AT&T customer with the number 615-573-2XX0 from the dates of November 25, 2016, through November 29, 2016. He also ran reports on a T-Mobile customer with the number of 615-240-9XX3, associated with Codefendant, with the date range of November 26, 2016, through November 27, 2016. He was able to set visual reports to show the phones' locations within a two-mile range from specific cell towers. Detective High testified that at 2:38 p.m. on November 27, 2016, Defendant's phone sent an outgoing text message. The phone was within the potential zone of coverage for Saint Louis Street. At 2:39 p.m., Defendant's phone was still connected to the cell phone tower within the coverage of Saint Louis Street. Several texts sent and received by Defendant's phone between 2:40:24 and 2:40:51 indicated Defendant's phone remained in communication with the cell phone tower within the Saint Louis Street coverage area. At 2:46 p.m., Defendant's phone received an incoming text message. At that time, the phone was communicating with a cell phone tower that was not within the coverage area of Saint Louis Street. Between 2:47 and 2:51, however, Defendant's texts and calls were going through a cell phone tower consistent with the coverage area of Saint Louis Street. At 2:55 p.m., an incoming voice call placed Defendant's phone "several miles away" from the Saint Louis Street address. Based on the tower, the cell phone technology indicated that Defendant's phone was moving westward. However, at 3:03, an incoming voice call that lasted six seconds to Defendant's voicemail again indicated that Defendant's phone was using a tower consistent with close proximity to the Saint Louis Street address. At 3:05, an outgoing call that lasted 18 seconds was inconsistent with the Saint Louis Street area. There was no cell phone usage for the 615-240-9XX3 number associated with Codefendant on November 27 between 2:00 p.m. and 3:30 p.m.

Detective High was also asked to review communications between another phone associated with Defendant ending in -6868, Defendant's phone with the number 615-573-2XX0, and another number associated with Codefendant between October 19 and 29, 2016. The analysis indicated that Defendant's phone ending in -6868 interacted with the phone associated with Codefendant several times, including one time on October 24.

After the State rested, the defense put on several witnesses including Lorenzo Russell, the owner of a landscaping company. Codefendant worked with Mr. Russell starting in 2014. Mr. Russell was unable to confirm whether Codefendant worked with him on October 24 or November 27, 2016.

- 11 -

Tamaria Clark is the cousin of Codefendant. She testified that on November 27, 2016, Codefendant drove her mother's gray Camry to take her to work at Old Navy in the Nashville West shopping center around 2:30 p.m. She identified the car and herself in a surveillance video from that date and time. The windows of the car were tinted and the driver of the car was not visible. Defendant's mother testified that she lived on 23rd Avenue North.

Quintel Hudson testified that he is a rapper who goes by the stage name, "Hunnid Round." He identified himself in several photographs. He explained that he and Defendant had a "miscommunication" in the past but at the time of trial they had no issues.

At the conclusion of the proof, Defendant was found guilty of two counts of premeditated murder, one count of felony murder, one count of attempted first degree murder, one count of employing a firearm during the commission a dangerous felony, and one count of felon in possession of a weapon. Codefendant was found not guilty. Apparently, Codefendant testified at trial. His testimony was either not transcribed or was removed from the record after his record was expunged.

The trial court sentenced Defendant to two terms of life in prison for the two first degree murder convictions, ordering Count 2 to run consecutively to Count 1. The trial court merged the felony murder conviction in Count 3 with Count 2. The trial court imposed a sentence of 20 years for the attempted first degree murder conviction, 10 years for the conviction of employing a firearm during the commission of a dangerous felony, and five years for the conviction of felon in possession of a firearm. The trial court ordered the sentence for employing a firearm during the commission of a dangerous felony to run consecutively to the sentences in Counts 1 and 2, for a total effective sentence of two consecutive life sentences followed by a sentence of 10 years.

Defendant filed a motion for new trial/motion for judgment of acquittal seeking to set aside his convictions. In the motion, Defendant challenged the sufficiency of the evidence, the trial court's approval of the verdict, the trial court's failure to consider mitigating factors, his "excessive" sentence, and the trial court's decision to allow "evidence in objected to by [Defendant]." In an amendment to the motion, Defendant argued that the trial court erred by "allowing a videotape of [] [D]efendant to be played for the jury"; failing to declare a mistrial when counsel for the State "repeatedly" played portions of "the recording that the [c]ourt previously ordered to be excluded"; refusing to allow Defendant to submit victim and witness statements to the jury from General Sessions Court; and failing to grant Defendant's motion for judgment of acquittal. Defendant also argued that there was "no evidence" to support the guilty verdict, that the verdict "shows prejudice against [] [D]efendant," that the trial court failed to act as thirteenth juror, and that Defendant was denied a fair trial.

The trial court denied the motion for new trial in a written order. The trial court determined that the evidence was sufficient to support the verdict and that the weight of the evidence supported the verdict. The trial court stood by its sentencing decision. With regard to the failure to apply mitigating factors, the trial court found "no error and reaffirm[ed] the findings in the sentencing order." The trial court pointed out that Defendant failed to provide or cite to the trial transcript "referencing the evidence to which he objected" that the trial court allowed into evidence. Similarly, the trial court noted that Defendant failed to provide or cite to the portion of the record regarding the allegedly "prejudicial videotape." As a result of these failures by Defendant, the trial court found no error. With regard to the failure to declare a mistrial, the trial court noted Defendant's failure to cite to the trial transcript referencing the same and establish how he was prejudiced. The trial court found no merit in Defendant's argument that the trial court erred by disallowing statements by witnesses in lower court proceedings or police interviews. The trial court pointed out that Defendant failed to provide these witnesses at the hearing on the motion for new trial, therefore the trial court was unable to ascertain error. Lastly, the trial court denied relief on the basis of cumulative error, concluding that there was no error. Defendant appealed, raising several issues. We will address each one in turn.

## *Analysis*

### *Tennessee Rule of Evidence 404(b)*

Defendant's first argument on appeal is that the trial court committed plain error by allowing the State to introduce evidence of prior bad acts in contravention of Tennessee Rule of Evidence 404(b). Specifically, Defendant complains about the introduction of evidence about the August 29, 2016 shooting and evidence of the October 24, 2016 shooting. Defendant admits that trial counsel failed to file a motion pursuant to 404(b) asking the trial court to hold a hearing on the matter and failed to object to the introduction of the evidence at trial, thus the only way the issue can be reviewed is via plain error. The State submits that Defendant is not entitled to plain error relief.

For evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Tenn. R. Evid. 403. Ordinarily, evidence of prior bad acts is inadmissible to show that a defendant acted in conformity with a character trait. Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its unfair prejudicial effect. Tenn. R. Evid. 404(b); *State v. Wyrick*, 62 S.W.3d 751, 771-2 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common

scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before admitting such evidence, the trial court must: (1) hold a hearing outside the jury's presence upon request; (2) determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; (3) find the proof of the other crime, wrong, or act to be clear and convincing; and (4) exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(1)-(4).

When a trial court substantially complies with the procedural requirements of Rule 404(b), this Court will not overturn the ruling absent an abuse of discretion. *See State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005). "'Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" *State v. Parker*, 350 S.W.3d 883, 897 (Tenn. 2011) (quoting *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

Defendant's failure to make a contemporaneous objection at trial to the introduction of evidence results in the waiver of the issue on appeal. *See* Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection . . . ."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). When a defendant has waived an issue on appeal, it is subject only to plain error review. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000).

This Court considers the following factors in determining whether plain error relief is warranted: (1) the record must clearly establish what occurred in the trial court; (2) there must be a breach of a clear and unequivocal rule of law; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *Id*. at 282-83. This Court need not consider all five factors when a single factor indicates that relief is not warranted. *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014). "[A]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Id*.

A. *Evidence of August 29, 2016 Shooting*

- 14 -

With regard to the introduction of evidence about the August 29, 2016 shooting, Defendant argues that the testimony from Mr. Williams "at least raised the possibility that [Defendant] was engaged in an unrelated shooting on August 29, 2016." Defendant complains that the State introduced the evidence to show that the same firearm was used in all three incidents but insists that the evidence is not admissible under 404(b) to show identity, intent, motive, opportunity, or rebuttal of mistake or accident and that the evidence was more prejudicial than probative. Defendant acknowledges that trial counsel did not request a hearing pursuant to 404(b), did not object to the introduction of the evidence at trial, and did not include the issue in a motion for new trial.

When a party seeks appellate review, there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal. *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993) (citing *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983)). Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue. *Id.* at 561 (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)). Absent the necessary relevant material in the record, an appellate court cannot consider the merits of an issue. *See* Tenn. R. App. P. 24(b). Here, there was a hearing on the admissibility of evidence of the August 2016 shooting prior to the morning of trial but it is not clear whether that hearing was held pursuant to 404(b). In any case, Defendant failed to include a transcript of the hearing that occurred prior to the morning of trial. Accordingly, the record does not accurately reflect what occurred in the trial court, and we conclude that the issue has been waived. *See Fayne*, 451 S.W.3d at 372. Defendant has not established all five factors necessary for plain error review.

### B. Evidence of October 24, 2016 Shooting

With respect to the evidence introduced at trial about the October 24, 2016 shooting, Defendant argues that there was no proof that Defendant was involved at all. In other words, Defendant argues that there was no way the State could argue that the evidence supported proof of Defendant's identity or helped to complete the story of the November shooting and that the introduction of the evidence was more prejudicial than probative.

Again, we decline to review the issue for plain error where Defendant has failed to establish all five factors necessary for relief. "[R]arely will pain error review extend to an evidentiary issue." *State v. Haymer*, 671 S.W.3d 568, 578 (Tenn. Crim. App. 2023) (quoting *State v. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007)), *no perm. app. filed*. Defendant has failed to show that a clear and unequivocal rule of law was breached. If the trial court was not even asked to make a discretionary decision under Tennessee Rule of Evidence 404(b), this Court is

certainly unable to discern whether that same trial court breached a clear and unequivocal rule of law. This Court has repeatedly held that a defendant cannot establish a clear and unequivocal rule of law was breached where the defendant failed to request a 404(b) hearing. *See, e.g.*, *State v. Sims*, No. W2013-01253-CCA-R3-CD, 2015 WL 5683755, at *14 (Tenn. Crim. App. Sept. 25, 2015), *perm. app. denied* (Tenn. Jan. 19, 2016); *State v. McLaughlin*, No. E2020-01434-CCA-R3-CD, 2021 WL 3869514, at *7 (Tenn. Crim. App. Aug. 31, 2021), *no perm. app. filed*; *State v. Curtis*, No. M2015-01372-CCA-R3-CD, 2016 WL 7654946, at *7 (Tenn. Crim. App. Aug. 26, 2016), *no perm. app. filed*; *State v. Higgins*, No. E2006-01552-CCA-R3-CD, 2007 WL 2792938, at *7 (Tenn. Crim. App. Sept. 27, 2007), *no perm. app. filed*; *State v. Owens*, No. W2001-01397-CCA-R3-CD, 2002 WL 31624774, at *14 (Tenn. Crim. App. Nov. 8, 2020), *perm. app. denied* (Tenn. Feb. 18, 2003). Defendant is not entitled to plain error review.

### *Introduction of Video*

Next, Defendant argues that the trial court permitted the State to play portions of a "video recording where Mr. Woods was depicted holding a firearm and making statements that could be considered threatening" over Defendant's objection. He argues that the recording, identified as trial exhibit 44, videos 6 and 7, was more prejudicial than probative and improperly admitted. Defendant states in a footnote that the record "indicates this [recording] was for ID purposes only, but the trial transcript indicates it was entered into evidence as a trial exhibit and played for the jury." The State argues that the issue is waived because Defendant did not object to the introduction of the recording at trial, failed to specify which videos he believed were erroneously introduced in his motion for new trial, and failed to cite to the record or make any argument supporting his allegations.

Looking to the record submitted to this Court on appeal, exhibit 44 was introduced in its entirety during the testimony of Detective Gary Shannon. The exhibit contains several video clips and several still images. Detective Shannon identified "still shots [of Defendant] from a video" taken from the HTC phone associated with Codefendant. Defendant complains about video clips 6 and 7 of Exhibit 44. These are video clips of people shooting off fireworks. Video 2 on the disk labeled Exhibit 44, on the other hand, is a video of Defendant making fun of a person calling himself "Hunnid Round." Defendant is seen moving a green gun into the view of the camera. The person recording the video, whose face is not shown in the video, can be seen moving a gun into view with their arm. The person recording the video speaks, and the voice is identified by Detective Shannon as Codefendant. The person recording the video states, "There's Glock 40s all in this bi*c*." Our review of the record indicates that counsel for Defendant did not object when the exhibit was introduced and actually introduced the testimony of the person known as "Hunnid Round" during defense proof. In the motion for new trial, Defendant complained about the introduction of a video without specifying the nature of the video.

At the hearing on the motion for new trial, defense counsel offered no argument, resting on the motion. The trial court found Defendant's failure to cite to the record or specifics of the complaint about the video made it impossible to "ascertain" error.

Here, because of Defendant's failure to state in the motion for new trial exactly what video he was challenging, we are constrained to review the issue via the lens of plain error. In our review, we note that Defendant has failed to show a clear and unequivocal rule of law was breached and the record does not accurately reflect what happened in the trial court. Defendant failed to object to the introduction of the video, and the record does not give the State's reason for introducing the video or the trial court's ruling on the admissibility of the video. If the trial court admitted the video after considering its relevance under Tennessee Rule of Evidence 403, that was a discretionary decision. Defendant is not entitled to plain error review where he cannot establish all five factors necessary for plain error review. *See Fayne*, 451 S.W.3d at 372.

*Sufficiency*

Defendant next challenges the sufficiency of the evidence with respect to his convictions for first degree murder, attempted first degree murder, and felony murder. Specifically, Defendant argues that there was no proof of premeditation and that the attempted killing of Mr. Pullens could not have been used as the predicate felony to sustain the conviction for felony murder because it was merely tangential to the killings of Mr. Miller and Ms. Adams. The State disagrees, arguing that Defendant acted with premeditation "when he got out of a car armed with at least one gun and shot three unarmed victims including shooting one victim in the back of the head at close range." Moreover, the State points out that the felony murder charge named the first degree murder of Mr. Miller as the predicate felony, not the attempted first degree murder of Mr. Pullens, therefore Defendant's argument is misplaced. We agree with the State.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the convictions. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929

S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court considers all of the evidence presented at trial, even if Defendant challenges the admissibility of some of the evidence on appeal. *See State v. Thomas Bolton*, No. W2012-02000-CCA-R3-CD, 2014 WL 12653829, at *10 (Tenn. Crim. App. Jan. 31, 2014) (citing *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981)), *no perm. app. filed*. Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Here, Defendant was charged with two counts of first degree murder, one count of felony murder, one count of attempted first degree murder, one count of employing a firearm during the commission of a dangerous felony, and one count of felon in possession of a weapon. On appeal, he challenges his convictions for first degree murder, felony murder, and attempted first degree murder. In relevant part, first degree murder is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Tennessee Code Annotated section 39-13-202(d) defines premeditation as:

> An act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The State must establish the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992), *overruled on other grounds by State v. Reynolds*, 635 S.W.3d 893, 917 (Tenn. 2021). The existence of premeditation is a question of fact for the jury and may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment

of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013).

As relevant here, felony murder is the killing of another committed in the perpetration of any first degree murder. T.C.A. § 39-13-202(a)(2). To support the felony murder conviction, the intent to commit the underlying felony had to exist before or concurrent with the commission of the act causing the death of the victim. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). A jury can reasonably infer that the defendant had the intent to commit the felony prior to or concurrent with the killing. *Id.* at 108. The killing "may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Buggs*, 995 S.W.2d at 106), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2021).

As relevant here, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). We note that serious bodily injury is not an element of attempted first degree murder. However, if a defendant is found guilty of attempted first degree murder "where the victim suffers serious bodily injury as defined in § 39-11-106," the defendant is not eligible for release until he serves 85 percent of his sentence. T.C.A. § 40-35-501(k)(5). Serious bodily injury is defined as bodily injury that involves (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) a broken bone of a child who is twelve years of age or less. T.C.A. §§ 39-11-106(a)(34)(A)-(F). This Court has held that the subjective nature of pain is a fact to be determined by the trier of fact. *State v. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*.

Defendant argues that there was no proof of premeditation and that the State did not prove felony murder in Count 4 because the State failed to show Defendant was engaged in the perpetration of attempted first degree murder in Count 3. Defendant's argument is perplexing because Count 3 of the indictment charged Defendant with the felony murder of Ms. Adams committed during the perpetration of the first degree murder of *Mr. Miller*, not the attempted first degree murder of *Mr. Pullens*, as suggested by Defendant. Defendant also claims that the attempted murder of Mr. Pullens was "tangential" or

"incidental" to the killings of both Mr. Miller and Ms. Adams. In Count 3, Defendant was charged with the felony murder of Ms. Adams committed during the first degree murder of Mr. Miller. The proof at trial, viewed in a light most favorable to the State, showed that Defendant intended to kill Mr. Miller and killed Ms. Adams and tried to kill Mr. Pullens at the same time and in the same place. Defendant and Codefendant fired on three unarmed victims. The ballistics evidence indicated that 15 shots were fired. Ms. Adams died of a single gunshot wound; Mr. Pullens was shot in the back. Mr. Pullens lay on top of Ms. Adams and watched Defendant shoot Mr. Miller, at least once from close range. Gunpowder stippling on Mr. Miller's head confirmed the close proximity of the gun held by Defendant when Mr. Miller was shot at a downward angle from two to three feet away. Mr. Pullens heard Mr. Miller ask Defendant what he had done wrong prior to being shot. The proof is sufficient for a rational trier of fact to find that Defendant acted with premeditation to support the conviction for the first degree murder of Mr. Miller, committed the murder of Ms. Adams in the perpetration of the killing of Mr. Miller, and committed the attempted first degree murder of Mr. Pullens resulting in serious bodily injury. While the evidence of premeditation was arguably somewhat circumstantial, the jury is charged with weighing the credibility of the witnesses, and we will not reweigh the evidence or substitute our inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant complains about his sentence on appeal. Specifically, he argues that the trial court improperly ordered consecutive sentencing. The State disagrees, noting that the trial court acted within its discretion and considered the proper principles and purposes of sentencing before ordering consecutive sentences.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the conduct involved; (5) evidence and information offered by the parties regarding the statutory mitigation and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make on his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other

alternative sentence," *see State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012), and also to consecutive sentencing determinations, *see State v. Pollard*, 432 S.W.3d 851, 860-61 (Tenn. 2013).  The burden of showing that a sentence is improper is upon the appealing party.  *See* T.C.A. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Bise*, 380 S.W.3d at 709-10.  Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result.  *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).  Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," T.C.A. § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5).  *Carter*, 254 S.W.3d at 344.  Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed."  T.C.A. § 40-35-103(2) and (4).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order consecutive sentencing if it finds any one of the statutory criteria by a preponderance of the evidence.  The trial court may impose consecutive sentences upon finding by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]"  T.C.A. § 40-35-115(b)(4).  In order to impose consecutive sentences based upon the dangerous offender classification, however, "trial courts must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'"  *Pollard*, 432 S.W.3d at 863 (citing *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)); *see State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999) (recognizing that two additional findings must be made prior to ordering consecutive sentences only under the dangerous offender category).

Here, the trial court imposed mandatory life sentences for two counts of first degree murder (Counts 1 and 2) and one count of felony murder (Count 3).  The trial court merged one count of first degree murder (Count 2) with the count of felony murder (Count 3) "as they were based on alternative theories of guilt."  The trial court found that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, pursuant to the enhancement factor found in

Tennessee Code Annotated section 40-11-114(1). The trial court based the application of this enhancement factor on Defendant's prior conviction for one count of possession of .5 grams of a Schedule II controlled substance with intent to sell, one count of unlawful possession of a firearm after having been previously convicted of a felony, one count of domestic violence, and one count of criminal trespass. The trial court also found that Defendant was unlawfully in possession of a firearm in the video that was submitted as an exhibit to the sentencing hearing. The trial court also found Defendant was a leader in the commission of an offense involving two or more actors. T.C.A. § 40-35-114(2). Lastly, the trial court determined that Defendant had, prior to trial, failed to comply with the conditions of a sentence involving release into the community when, as a juvenile, he was "adjudicated delinquent of violation of aftercare twice and that he was adjudicated delinquent of violating his probation twice." T.C.A. § 40-35-114(8). The trial court declined to find any mitigating factors, despite Defendant's argument that his youth should be considered.

The trial court ultimately ordered the sentence for the first degree murder of Ms. Adams (Count 2) to run consecutively to the sentence for the first degree murder of Mr. Miller (Count 1). The trial court merged the conviction for felony murder of Ms. Adams (Count 3) with the conviction for the murder of Ms. Adams (Count 2). The trial court ordered the 10-year sentence for the conviction of employing a firearm during the commission of a dangerous felony (Count 5) to run consecutively to the life sentences (Counts 1 and 2). The trial court ordered the 20-year sentence for attempted first degree murder (Count 4) to run concurrently with the other sentences, for a total effective sentence of two consecutive life sentences, followed by a sentence of 10 years.

Defendant insists that consecutive sentences were not the least severe measure necessary. However, the trial court did not abuse its discretion because the trial court considered all the principles and guidelines of sentencing and made the additional findings required by *Wilkerson*. As to consecutive sentencing, the trial court determined that as a matter of law, Defendant's conviction for employing a firearm during the commission of a dangerous felony (Count 5) had to be run consecutively to the underlying offense of attempted first degree murder (Count 4).[3] In addition, the trial court determined that Defendant was a "dangerous offender" pursuant to Tennessee Code Annotated section 40-35-115(b)(4), characterizing his behavior as "nothing short of outrageous," evincing "a complete and utter disregard for human life." The trial court determined that consecutive sentences reasonably related to the severity of the offenses because "[a]bsent consecutive sentencing, [] Defendant's sentence for his murder of Ms. Adams would effectively be

---

[3] The judgment forms do not reflect that Count 5 is run consecutively to Count 4. The judgment forms reflect that Count 5 is to run consecutively to Counts 1 and 2. On remand, the trial court should correct the judgment form in Count 5 to reflect that the sentence runs consecutively to Counts 1, 2, and 4.

moot, as it would be subsumed in his sentence for the murder of Mr. Miller." The trial court also determined that consecutive sentencing was necessary to "protect the public against further criminal conduct by [] Defendant." The trial court expressed hope that Defendant would be "rehabilitated" but found consecutive sentencing "to provide an effective deterrent" whereas concurrent sentencing would "provide no deterrent effect as [] Defendant would experience no increased punishment for his other criminal behavior outside of the murder of Mr. Miller," creating a "perverse incentive" for "potential defendant[s]" to commit multiple offenses "because there would be no increase punishment." The trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

### *Cumulative Error*

Finally, Defendant argues that the cumulative impact of the errors in this case prevented him from receiving a fair trial. The cumulative error doctrine applies when there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To that end, more than one actual error must exist before the cumulative error doctrine can apply. *Id.* at 77. Because Defendant has failed to establish that multiple errors occurred, he is not entitled to cumulative error relief.

### CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed. On remand, the trial court shall amend the judgment form for Count 5, to reflect that the sentence should run consecutively to Counts 1, 2, and 4.

_____
TIMOTHY L. EASTER, JUDGE